## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IVAN S. COHEN, Derivatively on Behalf of Nominal Defendant VERRICA PHARMACEUTICALS, INC., <br><br> Plaintiff, <br><br> v. <br><br> PAUL B. MANNING, TED WHITE, CRAIG BALLARON, LAWRENCE EICHENFIELD, DIEM NGUYEN, MARK PRYGOCKI, and SEAN STALFORT, <br><br> Defendants, <br><br> and <br><br> VERRICA PHARMACEUTICALS, INC., <br><br> Nominal Defendant. | Case No. _____ <br><br><br> **JURY TRIAL DEMANDED** |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Ivan S. Cohen ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Verrica Pharmaceuticals, Inc. ("Verrica" or the "Company"), against certain current and former members of the Company's Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breaches of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, United States Securities and Exchange Commission

("SEC") filings, press releases published by and regarding Verrica, legal filings, news reports, securities analysts' reports about the Company, the securities class action captioned *Gorlamari v. Verrica Pharmaceuticals, Inc.*, Case No. 2:22-cv-02226-MSG (E.D. Pa.) (the "Securities Class Action"), and other publicly available information.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought by Plaintiff on behalf of Verrica against certain of its officers and members of the Company's Board of Directors (the "Individual Defendants")[1] for breaches of their fiduciary duties from at least May 19, 2021 through May 24, 2022 (the "Relevant Period"), as set forth below.

2.      Verrica is a dermatology therapeutics company that develops and sells medications for skin diseases requiring medical intervention.

3.      The Company's commercial product is YCANTH, also referred to as VP-102, which is a proprietary drug-device combination that contains a formulation of cantharidin. VP-102 was developed for the treatment of molluscum contagiosum, a highly contagious skin disease caused by a pox virus. In order to manufacture VP-102, Verrica worked with Sterling Pharmaceuticals, LLC ("Sterling"), a contract manufacturing organization ("CMO").

4.      Starting in September 2019, Verrica regulatory sought approval of VP-102 by the U.S. Food and Drug Administration ("FDA") for the treatment of molluscum contagiosum.

5.      As detailed herein, throughout the Relevant Period, the Individual Defendants made materially false and/or misleading statements and failed to disclose material adverse facts to the investing public regarding the manufacturing of VP-102 and the FDA approval process for the

---

[1] The Individual Defendants are Paul B. Manning ("Manning"), Ted White ("White"), Craig Ballaron ("Ballaron"), Lawrence Eichenfield ("Eichenfield"), Diem Nguyen ("Nguyen"), and Sean Stalfort ("Stalfort"). "Defendants" means Verrica and the Individual Defendants.

drug. However, in reality, the FDA had discovered a litany of issues with the Sterling facility for the manufacturing of VP-102, which would ultimately delay the FDA's approval of VP-102.

6.      The truth began to emerge on September 20, 2021, when, after the market closed, Verrica announced the receipt of a Complete Response Letter ("CRL") from the FDA, detailing deficiencies found at the Sterling manufacturing facility.

7.      On this news, the Company's stock price fell $1.00 per share, or approximately 8.3%, to close at $11.03 per share on September 21, 2021.

8.      Then, on May 24, 2022, the truth fully emerged when Verrica announced that it received another CRL from the FDA, which detailed further deficiencies identified during an inspection of Sterling.

9.      On this news, the Company's stock price fell $3.55 per share, or approximately 63.8%, to close at $2.01 per share on May 25, 2022.

10.     As set forth herein, the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct the materially false and/or misleading statements and omissions of material fact to the investing public.  Specifically, the Individual Defendants failed to disclose to investors: (i) the FDA's investigation of Sterling in May 2021, and the Form 483 issued therewith; (ii) that the deficiencies identified by the FDA as a result of the May 2021 investigation were not resolved; (iii) the FDA's investigation of Sterling in February 2022 and the Form 483 issued therewith; (iv) that the foregoing FDA investigations and identified deficiencies posed significant risks to FDA approval of VP-102; and (v) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

11.     As a result of the foregoing, the Securities Class Action was filed against the Company, Defendant White, and other Company officers on June 6, 2022 in the United States District Court for the Eastern District of Pennsylvania.

12.     As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred significant financial losses, including the cost of defending and paying class-wide damages in the Securities Class Action, as well as additional losses, including reputational harm and loss of goodwill.

13.     Moreover, in light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and Defendants' liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Verrica's Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9) promulgated thereunder by the SEC.

15.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

16.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.    This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

18.    In connection with the acts, conduct and other wrongs complained of herein, the Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

19.    Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391(b)(1), as Verrica maintains its principal executive offices in this District and a substantial portion of the acts and omissions alleged herein, including the dissemination of materially false and misleading information, occurred in this District.

## PARTIES

### Plaintiff

20.    Plaintiff is, and has been at all relevant times, a shareholder of Verrica.

### Nominal Defendant

21.    Nominal Defendant Verrica is a Delaware corporation with its principal executive offices located at 44 West Gay Street, Suite 400, West Chester, Pennsylvania 19380.  Verrica's common stock trades on the NASDAQ under the ticker symbol "VRCA."

### Individual Defendants

22.    Defendant Manning has served as Chairman of the Board since 2017 and as a director of the Company since 2015. According to the Company's public filings, as of March 31, 2024, Defendant Manning, and entities affiliated with Manning, beneficially owned 36.8% of the outstanding shares of the Company.

23.     Defendant White has served as President and Chief Executive Officer ("CEO") of the Company since 2017 and as a director of the Company since 2018. According to the Company's public filings, White received $2,477,577 in compensation from the Company in 2021, and $1,935,834 in 2022.

24.     Defendant Ballaron has served as a director of the Company since June 2019. Ballaron also serves as Chair of the Board's Compensation Committee and as a member of the Board's Audit Committee and Nominating and Corporate Governance Committee. According to the Company's public filings, Ballaron received $119,935 in compensation from the Company in 2021, and $76,030 in 2022.

25.     Defendant Eichenfield has served as a director of the Company since July 2020. Eichefield also serves as Chair of the Board's Nominating and Corporate Governance Committee and as a member of the Board's Audit Committee and Compensation Committee. According to the Company's public filings, Eichenfield received $119,935 in compensation from the Company in 2021, and $76,030 in 2022.

26.     Defendant Nguyen has served as a director of the Company since June 2020. According to the Company's public filings, Nguyen received $99,935 in compensation from the Company in 2021, and $56,030 in 2022.

27.     Defendant Prygocki has served as a director of the Company since 2018. Prygocki also serves as Chair of the Board's Audit Committee and as a member of the Board's Compensation Committee and Nominating and Corporate Governance Committee. According to the Company's public filings, Prygocki received $119,935 in compensation from the Company in 2021, and $76,030 in 2022.

28.     Defendant Stalfort has served as a director of the Company since 2015.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

29.     By reason of their positions as officers and/or directors of Verrica, and because of their ability to control the business and corporate affairs of Verrica, the Individual Defendants owed Verrica and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Verrica in a fair, just, honest, and equitable manner.   The Individual Defendants were and are required to act in furtherance of the best interests of Verrica and its shareholders.

30.     Each director and officer of the Company owes to Verrica and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

31.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Verrica, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

32.     To discharge their duties, the officers and directors of Verrica were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

33.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Verrica, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the

Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

34.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

35.     To discharge their duties, the officers and directors of Verrica were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Verrica were required to, among other things:

(i)      Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Pennsylvania, and the United States, and pursuant to Verrica's own Code of Business Conduct and Ethics (the "Code of Conduct");

(ii)     Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(iii)    Remain informed as to how Verrica conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(iv)    Establish and maintain systematic and accurate records and reports of the business and internal affairs of Verrica and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(v)    Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Verrica's operations would comply with all applicable laws and Verrica's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(vi)    Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(vii)    Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(viii)    Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

36.    Each of the Individual Defendants further owed to Verrica and the shareholders the duty of loyalty requiring that each favor Verrica's interest and that of its shareholders over their

own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

37.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Verrica and were at all times acting within the course and scope of such agency.

38.     Because of their advisory, executive, managerial, and directorial positions with Verrica, each of the Individual Defendants had access to adverse, non-public information about the Company.

39.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Verrica.

## VERRICA'S CODE OF CONDUCT

40.     The Company's Code of Conduct states that "[w]e expect every director, officer and employee (collectively, "***personnel***") to read and understand the Code of Conduct and its application to the performance of his or her business responsibilities."

41.     In a section titled "Honest and Ethical Conduct," the Code of Conduct states:

It is our policy to promote high standards of integrity by conducting our affairs in an honest and ethical manner. The integrity and reputation of the Company depends on the honesty, fairness and integrity brought to the job by each person associated with us. Unyielding personal integrity is the foundation of corporate integrity.

42.     In a section titled "Legal Compliance," the Code of Conduct states, in relevant part:

Obeying the law is the foundation of the Code of Conduct. Our success depends upon our personnel operating within legal guidelines and cooperating with local, national and international authorities. We expect our personnel to understand the legal and regulatory requirements applicable to their business units and areas of responsibility. While we do not expect you to memorize every detail of these laws, rules and regulations, we want you to be able to determine when to seek advice from others. If you have a question about legal compliance, you must seek an answer from your supervisor or the Compliance Officer.

Disregard of the law will not be tolerated. Violation of laws, rules and regulations of any country may subject an individual, as well as the Company, to civil and/or criminal penalties. You should be aware that conduct and records, including emails, are subject to internal and external audits and to discovery by third parties in the event of a government investigation or civil litigation. It is in everyone's best interests to know and comply with our legal obligations.

43.     In a section titled, "Maintenance of Corporate Books, Records, Documents and

Accounts; Financial Integrity; Public Reporting," the Code of Conduct states:

The integrity of our records and public disclosure depends upon the validity, accuracy and completeness of the information supporting the entries in our books of account. Therefore, our corporate and business records should be completed accurately and honestly. The making of false or misleading entries is strictly prohibited. Our records serve as a basis for managing our business and are important in meeting our obligations to our partners, customers, contributors, creditors, employees and others with whom we do business. As a result, it is important that our books, records and accounts accurately and fairly reflect, in reasonable detail, our assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities. We require that:

- no entry be made in our books and records that intentionally hides or disguises the nature of any transaction or liabilities or misclassifies any transactions as to accounts or accounting periods;

- transactions be supported by appropriate documentation;

- the terms of commercial transactions be reflected accurately in the documentation for those transactions and all such documentation be reflected accurately in our books and records;

- personnel comply with our system of internal controls; and

- no cash or other assets be maintained for any purpose in any unrecorded or "off-the-books fund."

Our accounting records are also relied upon to produce reports for our management, stockholders and creditors, and governmental agencies. In particular, we rely upon our accounting and other business and corporate records in preparing the periodic and current reports we file with the SEC. Securities laws require that these reports provide full, fair, accurate, timely and understandable disclosure and fairly present our financial condition and results of operations. Employees who collect, provide or analyze information for or otherwise contribute in preparing or verifying these reports should strive to ensure that our financial disclosure is accurate and transparent and that our reports contain all of the information about the Company

11

that would be important to enable stockholders and potential investors to assess the soundness and risks of our business and finances and the quality and integrity of our accounting and disclosures. In addition:

- no employee may knowingly take or authorize any action that would cause our financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;

- all employees must cooperate fully with our accounting and audit teams, as well as our independent public accountants and counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that our books and records, as well as our reports filed with the SEC, are accurate and complete; and

- no employee should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of our reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of our reports accurate in all material respects.

Any employee who becomes aware of any departure from these standards has a responsibility to report his or her knowledge promptly to a supervisor, the Compliance Officer, the Audit Committee or one of the other compliance resources described in Section 10 or in accordance with the provisions of the Company's Open Door Policy for Reporting Complaints Regarding Accounting and Auditing Matters.

## VERRICA'S AUDIT COMMITTEE CHARTER

44.     Verrica's Audit Committee Charter states that "the primary purpose" of the Audit

Committee is to act on behalf of the Board in fulfilling the Board's oversight responsibilities with

respect to:

(i) the Company's corporate accounting and financial reporting processes, (ii) the Company's systems of internal control over financial reporting and audits of financial statements, (iii) the quality and integrity of the Company's financial statements and reports, (iv) the qualifications, independence and performance of the registered public accounting firm or firms of certified public accountants engaged as the Company's independent outside auditors for the purpose of preparing or issuing an audit report or performing audit services (the "*Auditors*") and (v) the performance of the Company's internal audit function, if and when the Company has such a function.

45.     The Audit Committee Charter's section titled "Purpose and Policy" goes on to state, in relevant part, that "[t]he policy of the Committee, in discharging these obligations, shall be to maintain and foster an open avenue of communication among the Committee and the Auditors, the Company's financial management and, if applicable, the Company's internal auditors."

46.     In a section titled "Responsibilities," the Audit Committee Charter states, in relevant part:

> The Committee shall oversee the Company's financial reporting process on behalf of the Board, shall have direct responsibility for the appointment, compensation, retention and oversight of the work of the Auditors and any other registered public accounting firm engaged for the purpose of performing other review or attest services for the Company. The Auditors and each such other registered public accounting firm shall report directly and be accountable to the Committee. The Committee's functions and procedures should remain flexible to address changing circumstances most effectively. To implement the Committee's purpose and policy, the Committee shall be charged with the following functions and processes with the understanding, however, that the Committee may supplement or (except as otherwise required by applicable laws or rules) deviate from these activities as appropriate under the circumstances. . . .

> _Responsibilities with respect to Financial Statements and Related Disclosures_

> **11.**     _Audited Financial Statement Review._ To review, upon completion of the audit, the financial statements proposed to be included in the Company's Annual Report on Form 10-K to be filed with the SEC and to recommend to the Board whether or not such financial statements should be so included.

> **12.**     _Annual Audit Results._ To review with management and the Auditors the results of the annual audit, including the Auditors' assessment of the quality, not just acceptability, of the Company's accounting principles and practices, the Auditors' views about qualitative aspects of the Company's significant accounting practices, the reasonableness of significant judgments and estimates (including material changes in estimates), all known and likely misstatements identified during the audit (other than those the Auditors believe to be trivial), the adequacy of the disclosures in the financial statements and any other matters required to be communicated to the Committee by the Auditors under the standards of the PCAOB.

> **13.**     _Quarterly Results_. To review and discuss with management and the Auditors, as appropriate, the results of the Auditors' review of the Company's quarterly financial statements, prior to public disclosure of quarterly financial

information, if practicable, or filing with the SEC of the Company's Quarterly Report on Form 10-Q, and any other matters required to be communicated to the Committee by the Auditors under standards of the PCAOB.

14. ***Management's Discussion and Analysis***. To review and discuss with management and the Auditors, as appropriate, the Company's disclosures contained under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations" in its periodic reports to be filed with the SEC.

15. ***Disclosure Committee.*** To meet with the Disclosure Committee (or a representative thereof), as part of the Committee's regular review of the Company's Form 10-K and Form 10-Q reports (and other filings by the Company with the SEC, when applicable and as deemed necessary, appropriate or desirable by management).

16. ***Press Releases.*** To review and discuss with management and the Auditors, as appropriate, earnings press releases, and press releases containing information relating to material developments as well as the substance of financial information, information relating to material developments and earnings guidance provided to analysts and rating agencies, which discussions may be general discussions of the type of information to be disclosed or the type of presentation to be made. The Chairman of the Committee may represent the entire Committee for purposes of these discussions.

17. ***Accounting Principles and Policies.*** To review with management and the Auditors, as appropriate, significant issues that arise regarding accounting principles and financial statement presentation, including critical accounting policies and practices, alternative accounting policies available under generally accepted accounting principles ("***GAAP***") related to material items discussed with management, the potential impact on the Company's financial statements of off-balance sheet structures and, if in the judgment of the Committee such review is necessary or appropriate, any other significant reporting issues and judgments, significant regulatory, legal and accounting initiatives or developments that may have a material impact on the Company's financial statements, compliance programs and policies.

18. ***Management Cooperation with Audit.*** To evaluate the cooperation received by the Auditors during their audit, including a review with the Auditors of any significant difficulties encountered during the audit or any restrictions on the scope of their activities or access to required records, data and information, significant disagreements with management whether or not resolved, and management's response, if any.

19. ***Risk Assessment and Management.*** To review and discuss with management and the Auditors, as appropriate, the Company's guidelines and

policies with respect to risk assessment and risk management, including risks relating to the Company's accounting matters, financial reporting and legal and regulatory compliance and the steps taken by management to monitor and control these exposures; and to review and discuss with management, as appropriate, insurance programs, including director and officer insurance, product liability insurance and general liability insurance.

**20.**    ***Management Letters.*** To review and discuss with the Auditors and, if appropriate, management, any management or internal control letter issued or, to the extent practicable, proposed to be issued by the Auditors and management's response, if any, to such letter, as well as any additional material written communications between the Auditors and management.

**21.**    ***Disagreements Between Auditors and Management.*** To review and discuss with management and the Auditors, or any other registered public accounting firm engaged to perform review or attest services, any conflicts or disagreements between management and the Auditors, or such other accounting firm, whether or not resolved, regarding financial reporting, accounting practices or policies or other matters, that individually or in the aggregate could be significant to the Company's financial statements or the Auditors' report, and to resolve any conflicts or disagreements regarding financial reporting.

*Responsibilities with respect to Internal Audit and Internal Control*

**22.**    ***Internal Control Over Financial Reporting.*** To confer with management and the Auditors, as appropriate, regarding the scope, adequacy and effectiveness of the Company's internal control over financial reporting including (a) significant deficiencies or material weaknesses identified by the Company's Auditors, as well as any special steps adopted in light of significant deficiencies or material weaknesses, if any, and the adequacy of disclosures about changes in internal control over financial reporting, and (b) any fraud, whether or not material, that involves management or other employees who have any significant role in the Company's internal control over financial reporting.

**23.**    ***Internal Audit Function.*** To evaluate from time to time the necessity for the Company to adopt a formal internal audit function. At such time as the Company adopts an internal audit function, the Committee shall coordinate the Board's oversight of the performance of that function. In this regard, the Committee shall review the appointment of the senior internal auditing manager and shall review any reports to management or the Board from the internal audit department and management's response to such reports.

**24.**    ***Separate Sessions.*** Periodically, to meet in separate sessions with the Auditors, the internal auditors or other personnel responsible for the internal audit function, if applicable and as appropriate, and management to discuss any matters that the Committee, the Auditors, the internal auditors or other personnel

responsible for the internal audit function, if applicable, or management believe should be discussed privately with the Committee.

*Other Responsibilities*

**25.** ***Related-Person Transactions.*** To establish a policy for the identification, review, consideration and approval or ratification of transactions involving the Company and any related person, and consistent with such policy, to consider such transactions for approval or ratification.

**26.** ***Correspondence with Regulators.*** To consider and review with management, the Auditors, outside counsel, as appropriate, and, in the judgment of the Committee, any special counsel, separate accounting firm or other consultants and advisors as the Committee deems appropriate, any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies.

**27.** ***Complaint Procedures.*** To establish procedures, when and as required by applicable laws and rules, for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters and the confidential and anonymous submission by employees of concerns regarding questionable accounting or auditing matters, and to establish such procedures as the Committee may deem appropriate for the receipt, retention, and treatment of complaints received by the Company with respect to any other matters that may be directed to the Committee for review and assessment.

**28.** ***Regulatory and Accounting Initiatives.*** To review with counsel and the Auditors and/or management, as appropriate, any significant accounting and financial reporting initiatives, matters, programs or policies, or regulatory matters related to accounting and financial reporting matters if, in the judgment of the Committee, such review is necessary or appropriate.

**29. Cybersecurity.** *The Committee will periodically review and discuss with the Company's Chief Financial Officer, material risks relating to data privacy, technology and information security, including cybersecurity, threats and back-up of information systems and the Company's processes for assessing, identifying, and managing such risks, as well as the Company's internal controls and disclosure controls and procedures relating to cybersecurity incidents.*

**30.** ***Ethical Compliance.*** To review the results of management's efforts to monitor compliance with the Company's programs and policies designed to ensure adherence to applicable laws and rules, as well as to its Code of Ethical Conduct.

**31.** ***Investigations.*** To investigate any matter brought to the attention of the Committee within the scope of its duties if, in the judgment of the Committee, such investigation is necessary or appropriate.

**32.**    *Proxy Report.* To prepare the report required by the rules of the SEC to be included in the Company's annual proxy statement.

**33.**    *Annual Charter Review.* To review and assess the adequacy of this Charter annually and recommend any proposed changes to the Board for its consideration and approval.

**34.**    *Report to Board.* To report to the Board with respect to material issues that arise regarding the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance or independence of the Auditors, the performance of the Company's internal audit function, if applicable, or such other matters as the Committee deems appropriate from time to time or whenever it shall be called upon to do so.

**35.**    *Annual Committee Evaluation.* To conduct an annual evaluation of the performance of the Committee.

**36.**    *General Authority.* To perform such other functions and to have such powers as may be necessary or appropriate in the efficient and lawful discharge of the foregoing.

It shall be the responsibility of management to prepare the Company's financial statements and periodic reports to be filed with the SEC, and the responsibility of the Auditors to audit those financial statements. These functions shall not be the responsibility of the Committee, nor shall it be the Committee's responsibility to ensure that the financial statements or periodic reports are complete and accurate, conform to GAAP, are free of fraud, or otherwise comply with applicable laws.

## SUBSTANTIVE ALLEGATIONS

*Background*

47.    Verrica is a dermatology therapeutics company that develops and sells medications for skin diseases requiring medical intervention. The Company's current product portfolio consists of one approved product and two pipeline products.

48.    The Company's commercial product is YCANTH, also referred to as VP-102, which is a proprietary drug-device combination that contains a formulation of cantharidin, which is a fatty substance that is secreted by blister beetles and often used to remove warts.

49.    VP-102 is a topical solution that was developed for the treatment of molluscum

contagiosum, a highly contagious skin disease caused by a pox virus.

50.     In order to manufacture VP-102, Verrica worked with Sterling. Sterling is a full-service pharmaceutical CMO that specializes in ophthalmic and veterinary medicine.

51.     The development of VP-102 was the main focus of the Company, and therefore the success of VP-102 was vital to Verrica. According to annual report for the fiscal year ended December 31, 2021 filed on a Form 10-K with the SEC on March 2, 2022 (the "2021 10-K"), the Company has "devoted substantially all of our financial resources and efforts to the development of our novel topical solution of cantharidin and our lead product candidate, VP-102, for the treatment of molluscum, including preclinical studies and clinical trials.

***The FDA Approval Process***

52.     Before a drug can be legally sold and marketed in the United States, it must be approved by the FDA through a New Drug Application ("NDA").[2]

53.     According to the FDA, the goals of the NDA are to:

provide enough information to permit FDA reviewer to reach the following key decisions:

- Whether the drug is safe and effective in its proposed use(s), and whether the benefits of the drug outweigh the risks.

- Whether the drug's proposed labeling (package insert) is appropriate, and what it should contain.

- Whether the methods used in manufacturing the drug and the controls used to maintain the drug's quality are adequate to preserve the drug's identity, strength, quality, and purity.

*Id.*

54.     Specifically, when considering an NDA, the FDA requires that drug manufacturers

---

[2] *New Drug Application (NDA)*, U.S. FOOD AND DRUG ADMIN., https://www.fda.gov/drugs/types-applications/new-drug-application-nda (last visited Oct. 18, 2024).

comply with its Current Good Manufacturing Practice ("cGMP") regulations, which are minimum requirements for the methods, facilities, and controls used in manufacturing, processing, and packaging of a product.[3]

55.    After an NDA is received, the FDA has sixty days to decide whether to file it so it can be reviewed.[4] If the FDA files the NDA, the FDA review team is assigned to evaluate the research on the drug's safety and effectiveness. *Id.*

56.    As part of the NDA review, the FDA conducts a pre-approval inspection of manufacturing facilities where the product is manufactured to determine whether the facilities comply with cGMP.[5]

57.    The FDA will issue a Form 483 to the company's management when an inspection is complete if the investigators have observed any objectionable conditions that may constitute violations of the Food and Drug Cosmetic Act and other related acts. A Form 483 is not a final FDA determination on the NDA but will be considered along with an Establishment Inspection Report ("EID"), and all other evidence or documentation collected on-site and any responses made by the company.[6]

58.    Following an inspection, the FDA will classify the inspection as one of the following:

---

[3] *Current Good Manufacturing Practice (CGMP) Regulations*, U.S. FOOD AND DRUG ADMIN., https://www.fda.gov/drugs/pharmaceutical-quality-resources/current-good-manufacturing-practice-cgmp-regulations (last visited Oct. 18, 2024).

[4] *FDA's Drug Review Process: Continued*, U.S. FOOD AND DRUG ADMIN., https://www.fda.gov/drugs/information-consumers-and-patients-drugs/fdas-drug-review-process-continued#:~:text=The%20pre%2DNDA%20period%2C%20just,how%20to%20use%20the%20drug) (last visited Oct. 18, 2024).

[5] *Types of FDA Inspections*, U.S. FOOD AND DRUG ADMIN., https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/inspection-basics/types-fda-inspections (last visited Oct. 18, 2024).

[6] *FDA Form 483 Frequently Asked Questions*, U.S. FOOD AND DRUG ADMIN., https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/inspection-references/fda-form-483-frequently-asked-questions (last visited Oct. 18, 2024).

- **No Action Indicated (NAI)** classification indicates a facility is in an acceptable state of compliance. The facility, usually, was not issued a Form FDA 483 or FDA-4056 at the conclusion of the inspection.

- **Voluntary Action Indicated (VAI)** classification indicates the inspection found objectionable conditions or practices but the agency has determined the facility can voluntarily correct its deficiencies and will not recommend any action. Usually, the facility was issued a Form FDA 483 or FDA-4056 at the conclusion of the inspection.

- **Official Action Indicated (OAI)** classification indicates a facility is in an unacceptable state of compliance. The facility may have been issued a Form FDA-483 or FDA-4056 at the conclusion of the inspection.[7]

59.     Finally, when making a decision on an NDA, the FDA will issue applicants an approval letter or a CRL. An approval letter authorizes commercial marketing of the product, while a CRL indicates that the review cycle for the application is complete and that the application is not ready for approval.[8]

*FDA Approval of VP-102*

60.     Prior to and throughout the Relevant Period, Verrica sought approval of VP-102 by the FDA for the treatment of molluscum contagiosum.

61.     Following positive top-line results from Verrica's Phase 3 clinical trials of VP-102, in September 2019, the Company submitted an NDA to the FDA.

62.     On July 14, 2020, the Company announced that it received a CRL from the FDA seeking additional information regarding the Chemistry, Manufacturing, and Controls ("CMC") process for the drug. The Company noted that "the FDA did not identify any clinical deficiencies."

63.     In response to this CRL, the Company changed its packaging of VP-102 and

---

[7] Inspections Database Frequently Asked Questions, U.S. FOOD AND DRUG ADMIN., https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/inspection-references/inspections-database-frequently-asked-questions (last visited Oct. 18, 2024).
[8] *Complete Response Letter Final Rule*, U.S. FOOD AND DRUG ADMIN., https://www.fda.gov/drugs/laws-acts-and-rules/complete-response-letter-final-rule (last visited Oct. 18, 2024).

resubmitted its NDA to the FDA in December 2020. On February 17, 2021, the Company announced that the resubmitted NDA for VP-102 was accepted for filing by the FDA.

64.     On April 13, 2021, during the 20th Annual Needham Healthcare Conference, Defendant White announced that the FDA had inspections planned for two facilities as part of the pre-approval inspection of for Verrica's NDA for VP-102—the Sterling facility and Piramal Pharma Solutions ("PPS").

65.     Between May 3, 2021 and May 14, 2021, the FDA conducted an inspection of the Sterling facility in connection with Verrica's NDA for VP-102. Unbeknownst to investors, as a result of this investigation, the FDA issued a Form 483, detailing cGMP deficiencies found at the facility. The FDA subsequently issued an EIR for the May 2021 inspection.

66.     On May 28, 2021, the Company announced that the FDA extended the review period for the NDA for VP-102 that was resubmitted in December 2020.

67.     Then, as detailed herein, on September 20, 2021, the Company announced that it received a CRL from the FDA on September 16, 2021 in response to the NDA for VP-102. As a result, the FDA classified Sterling as VAI and issued an EIR on November 17, 2021.

68.     On November 29, 2021, the Company announced that it once again resubmitted the NDA for VP-102 to the FDA, stating, in relevant part that "[t]he resubmission addresses the successful resolution of inspection deficiencies identified at a contract manufacturing organization (CMO) in the CRL."

69.     Following this resubmission, the FDA conducted an inspection of the Sterling facility from February 7, 2022 through February 18, 2022. As a result of this investigation, the FDA issued another Form 483, detailing cGMP deficiencies with the manufacturing facility for VP-102.

70.     On June 28, 2022, Verrica issued a press release announcing that the Company held a Type A meeting with the FDA regarding the path forward for the resubmission and potential approval of the NDA for VP-102.

71.     Then, on August 11, 2022, Verrica announced that it began working with PPS for the production of its bulk solution of VP-102.

72.     On September 27, 2022, the FDA issued a warning letter to Sterling. The warning letter stated, in relevant part, "[b]ecause your methods, facilities, or controls for manufacturing, processing, packing, or holding do not conform to CGMP, your drug products are adulterated within the meaning of section 501(a)(2)(B) of the Federal Food, Drug, and Cosmetic Act (FD&C Act), 21 U.S.C. 351(a)(2)(B). . . .Your firm's poor manufacturing practices are particularly concerning because many of your products. . . are ophthalmic and directed for use in young children."

73.     Following the transfer to PPS for manufacturing of VP-102, Verrica resubmitted the NDA for VP-102 to the FDA on January 23, 2023.

74.     Then, on July 21, 2023, VP-102 was approved for the FDA for the treatment of molluscum contagiosum in adult and pediatric patients two years of age and older.

***Individual Defendants' Materially False and Misleading Statements***

75.     Throughout the Relevant Period, the Individual Defendants made materially false and/or misleading statements and failed to disclose material adverse facts regarding the manufacturing of VP-102 and the FDA approval process for the drug. However, in reality, the FDA had discovered a litany of issues with the Sterling facility for the manufacturing of VP-102, which would ultimately delay the FDA's approval of VP-102.

76.     For instance, on May 19, 2021, Defendant White attended the RBC Capital Markets

Global Healthcare Conference on behalf of the Company, and, when asked for an update on the

FDA inspection of the two manufacturing facilities the Company was using for VP-102, Defendant

White stated "we fully anticipate that we'll have our inspections take place according to plan, and

we have not been notified otherwise."

77.     Then, on May 28, 2021, the Company issued a press release announcing that the

FDA extended the review period for the Company's NDA for VP-102. The press release stated, in

relevant part:

> Verrica Pharmaceuticals Inc. ("Verrica") (Nasdaq: VRCA), a dermatology
> therapeutics company developing medications for skin diseases requiring medical
> interventions, today announced that the U.S. Food and Drug Administration (FDA)
> has extended the review period for the New Drug Application (NDA) for VP-102
> for the treatment of molluscum contagiosum (molluscum). The Prescription Drug
> User Fee Act (PDUFA) goal date has been extended by three months to September
> 23, 2021.
>
> The FDA extended the PDUFA goal date to allow the Agency to have additional
> time to review information submitted by Verrica, including its training program
> and distribution model, in response to comments from the agency regarding the
> Company's human factors study. On May 26, 2021, the FDA informed Verrica that
> the information submitted has been designated a major amendment, which allows
> FDA to take an additional three months to review the submitted information.

78.     In the press release, Defendant White was quoted as saying "[w]e remain confident

in VP-102 as a potential treatment for patients with molluscum. . . .Importantly, the FDA has

recently completed one of the two pre-approval inspections required for approval. We look

forward to our continued productive discussions with the FDA as it completes its review of our

VP-102 NDA."

79.     On June 2, 2021, Defendant White attended the Jeffries 2021 Virtual Healthcare

Conference on behalf of Verrica, where Defendant White discussed the NDA for VP-102, stating:

> We resubmitted the NDA 5 months later in December of 2020. We received
> acceptance from the agency in early 2021. We received a PDUFA goal date of June
> 23 of this year, and now that has been extended by 3 months. So, our new PDUFA

goal date is September 23 to give the agency more time to review data and complete one inspection at one of our facilities.

80.    On August 10, 2021, the Company issued a press release announcing its financial results for the second quarter of 2021 (the "2Q21 Earnings Press Release"). The 2Q21 Earnings Press Release stated, in relevant part:

**Business Highlights and Recent Developments**

- In May 2021, the Company announced that the U.S. Food and Drug Administration (FDA) extended the Prescription Drug User Fee Act (PDUFA) goal date for the New Drug Application (NDA) for VP-102 (cantharidin 0.7% Topical Solution) for the treatment of molluscum contagiosum by three months to September 23, 2021 to allow the Agency additional time to review information requested and submitted regarding the Company's training program and distribution model.

- The Company continued to expand its U.S. commercial operations during the quarter in preparation for the potential FDA approval of VP-102, and has made key hires in marketing, sales and payor functions to support product launch and commercialization. The Company will be focusing its sales efforts in Dermatology, Pediatric Dermatology and key academic centers and health systems.

- The Company strengthened its management team in anticipation of the potential commercial launch of VP-102 with the appointment of Terry Kohler as Chief Financial Officer, effective July 16, 2021. Mr. Kohler is a strategic and operational finance leader with over 20 years of commercial business experience, most recently at a global pharmaceutical company with annual revenues over $2 billion.

81.    In the 2Q21 Earnings Press Release, Defendant White stated:

This quarter, we continued to ramp up commercial preparations for the potential FDA approval of VP-102, our lead product candidate for the treatment of molluscum contagiosum, including strengthening our senior leadership team and ensuring patient access to VP-102 through productive dialogue with medical providers and payors. . . .With a strong financial position, and a PDUFA goal date of September 23, 2021, we continue to invest in our commercial capabilities and, if approved, we look forward to the opportunity to launch VP-102 in the fourth quarter of 2021.

82.    On November 12, 2021, the Company issued a press release announcing the financial results for the third quarter of 2021 (the "3Q21 Earnings Press Release"), wherein Defendant White was quoted as saying:

24

We are pleased that the issues identified at the CMO unrelated to VP-102 have been successfully resolved, enabling us to move toward approval. . . .We remain confident in VP-102's commercial potential. There is a high unmet medical need for molluscum treatments—the viral skin disease affects approximately 6 million people a year in the U.S., mostly children, and there are no FDA-approved treatments. We look forward to continuing our dialogue with the FDA on the appropriate path forward for approval of VP-102.

83.    The 3Q21 Earnings Press Release also stated, in relevant part:

**Business Highlights and Recent Developments**

- On September 20, 2021, Verrica announced that the U.S. Food and Drug Administration ("FDA") issued a Complete Response Letter ("CRL") regarding its New Drug Application ("NDA") for VP-102 (cantharidin 0.7% Topical Solution) for the treatment of molluscum contagiosum ("molluscum"). According to the CRL, the FDA identified deficiencies at a facility of a contract manufacturing organization ("CMO"), which were not specifically related to the manufacturing of VP-102 but instead raised general quality issues at the facility. The FDA did not identify any clinical, safety or product specific Chemistry, Manufacturing, and Controls ("CMC") deficiencies related to VP-102. Following the CRL, on September 22, 2021 Verrica received a General Advice Letter from the FDA with recommendations to improve YCANTH's user interface.

- On November 5, 2021, Verrica was notified that the inspection of the CMO has been classified as "voluntary action indicated" ("VAI"), is now closed and that the VAI classification will not directly negatively impact FDA's assessment of the Company's NDA regarding this CMO. With the satisfactory resolution of the facility inspection, Verrica has engaged the FDA to determine the next steps toward the potential approval of VP-102 for the treatment of molluscum.

- In October 2021, the Company submitted an Investigational New Drug Application ("IND") for LTX-315, a first-in-class oncolytic peptide, for use in basal cell carcinoma. The Company expects to initiate our Phase 2 trial in basal cell carcinoma in the first quarter of 2022.

84.    Also on November 12, 20221, the Company filed its quarterly report for the period ended September 30, 2021 on a Form 10-Q with the SEC (the "3Q21 10-Q"). The 3Q21 10-Q stated, in relevant part:

On September 17, 2021, the FDA issued a CRL regarding our NDA for VP-102. According to the CRL, the FDA identified deficiencies at a facility of a contract

manufacturing organization, or CMO, which are not specifically related to the manufacturing of VP-102 but instead raise general quality issues at the facility. The FDA did not identify any clinical, safety or product specific Chemistry, Manufacturing, and Controls, or CMC, deficiencies related to VP-102. Following the CRL, on September 22, 2021 we received a General Advice Letter from the FDA with recommendations to improve YCANTH's user interface. On November 5, 2021, we were notified that the inspection of the CMO has been classified as "voluntary action indicated", or VAI, is now closed and that the VAI classification will not directly negatively impact FDA's assessment of our NDA regarding this CMO. With the satisfactory resolution of the facility inspection, we have engaged the FDA to determine the next steps towards the potential approval of VP-102 for the treatment of molluscum.

85.     The 3Q21 10-Q was signed by Defendant White. The 3Q21 10-Q was also accompanied by a certification made by Defendant White pursuant to Exchange Act Rule 13a-14(a) and Section 302 of the Sarbanes-Oxley Act of 2002 (the "SOX Certification"). In the SOX Certification, Defendant White attested to the accuracy of the 2021 10-K.

86.     On March 2, 2022, Verrica filed the "2021 10-K. The 2021 10-K stated, in relevant part:

On September 17, 2021, the FDA issued a CRL regarding our NDA for VP-102. According to the CRL, the FDA identified deficiencies at a facility of a contract manufacturing organization, or CMO, which are not specifically related to the manufacturing of VP-102 but instead raise general quality issues at the facility. The FDA did not identify any clinical, safety or product specific CMC deficiencies related to VP-102. Following the CRL, on September 22, 2021, we received a General Advice Letter from the FDA with recommendations to improve VP-102's user interface. On November 5, 2021, we were notified that the inspection of the CMO that had been classified as "voluntary action indicated", or VAI, is now closed and that the VAI classification would not directly negatively impact FDA's assessment of our NDA regarding this CMO. With the satisfactory resolution of the facility inspection, we resubmitted the NDA for the approval of VP-102 for the treatment of molluscum on November 29, 2021. The resubmission was limited to those sections and elements of the NDA that were identified as deficiencies in the CRL issued by the FDA in September 2021. The resubmission addressed the successful resolution of inspection deficiencies identified at the CMO in the CRL, as well as the recommendations included in the General Advice Letter received from the FDA that relate to VP-102's user interface. On December 15, 2021 the FDA accepted our NDA resubmission for VP-102 and assigned a new PDUFA date of May 24, 2022.

87. The 2021 10-K was signed by Defendants White, Manning, Stalfort, Ballaron, Prygocki, Eichenfield, and Nguyen. The 2021 10-K was also accompanied by a SOX Certification, wherein Defendant White attested to the accuracy of the 2021 10-K.

88. On March 9, 2022, Defendant White attended the Cowen 42nd Annual Health Care Conference on behalf of Verrica. When asked about the May 2022 date for the NDA for VP-102, Defendant White stated, in relevant part "I will tell you that we've had a very consistent and very productive communication with the FDA and we'll continue to work with the FDA toward an approval of YCANTH on or before our May PDUFA date. . . ."

89. On April 14, 2022, Defendant White attended the 21st Annual Needham Virtual Healthcare Conference on behalf of Verrica. During the conference, Defendant White was asked about the CRLs that the Company had received from the FDA, and, in response, Defendant White stated, in relevant part "[a]nd what we've done, just to ensure that everything is ready to go. We hired Jeff Yuen & Associates who is a former FDA inspector, as well as Greenleaf. And we had them go out go out and do mock inspections at all of our CMO facilities to ensure that all our CMOs were inspection ready." When asked about whether the public could see approval of the NDA by late May, Defendant White responded "Yes, I am very optimistic."

90. On May 9, 2022, the Company filed its quarterly report for the period ended March 31, 2022 on a Form 10-Q with the SEC (the "1Q22 10-Q"). The 1Q22 10-Q stated, in relevant part:

> On September 17, 2021, the FDA issued a CRL regarding our NDA for VP-102. According to the CRL, the FDA identified deficiencies at a facility of a contract manufacturing organization, or CMO, which are not specifically related to the manufacturing of VP-102 but instead raise general quality issues at the facility. The FDA did not identify any clinical, safety or product specific Chemistry, Manufacturing, and Controls, or CMC, deficiencies related to VP-102. Following the CRL, on September 22, 2021 we received a General Advice Letter from the FDA with recommendations to improve VP-102's user interface. On November 5,

2021, we were notified that the inspection of the CMO has been classified as "voluntary action indicated", or VAI, is now closed and that the VAI classification will not directly negatively impact FDA's assessment of our NDA regarding this CMO. With the satisfactory resolution of the facility inspection, we resubmitted the NDA for the approval of VP-102 for the treatment of molluscum on November 29, 2021. The resubmission was limited to those sections and elements of the NDA that were identified as deficiencies in the CRL issued by the FDA in September 2021. On December 15, 2021 the FDA accepted our NDA resubmission for VP-102 and assigned a new PDUFA goal date of May 24, 2022.

91.    The 1Q22 10-Q was accompanied by a SOX Certification made by Defendant White, wherein Defendant White attested to the accuracy of the 1Q22 10-Q. Defendant White also signed the 1Q22 10-Q.

92.    The above statements were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Individual Defendants failed to disclose to investors that: (i) the FDA's investigation of Sterling in May 2021, and the Form 483 issued therewith; (ii) that the deficiencies identified by the FDA as a result of the May 2021 investigation had not been resolved; (iii) the FDA's investigation of Sterling in February 2022 and the Form 483 issued therewith; (iv) that the foregoing investigations and deficiencies posed significant risks to FDA approval of VP-102; and (v) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

***The Truth is Revealed***

93.    The truth began to emerge on September 20, 2021, when, after the market closed, Verrica announced the receipt of a CRL from the FDA. The press release announcing the CRL stated, in relevant part, "[a]ccording to the CRL, the FDA has identified deficiencies at a facility of a contract manufacturing organization (CMO), which are not specifically related to the manufacturing of VP-102 but instead raise general quality issues at the facility."

94.     On this news, the Company's stock price fell $1.00 per share, or approximately

8.3%, to close at $11.03 per share on September 21, 2021.

95.     However, the Company continued to downplay the deficiencies with the Sterling

facility and the impact it would have on the NDA for VP-102. The September 20, 2021 press

release stated:

> At no time prior to the CRL was the Company notified by the FDA of any
> deficiencies at the CMO related specifically to the manufacturing of VP-102 or that
> their general investigation of the facility would have any impact on the Company's
> NDA.  More importantly, the FDA did not identify any clinical, safety or product
> specific Chemistry, Manufacturing, and Controls (CMC) deficiencies related to
> VP-102.
>
> The Company understands from the CMO that it has implemented corrective
> actions to address the Agency's concerns and the CMO has advised Verrica that it
> is expecting a satisfactory resolution of the facility's identified deficiencies from
> the FDA within the next 30 business days.  During this timeframe, the Company
> will engage with the Agency to demonstrate that the Company's good
> manufacturing practices, controls and processes ensure that any deficiencies at the
> CMO do not impact the efficacy, safety or quality of VP-102.
>
> "We remain confident that we have a path forward for VP-102 as a potential
> treatment option for molluscum, a highly contagious viral skin disease affecting
> approximately six million people in the United States – primarily children – for
> which there are currently no FDA-approved treatments," said Ted White, Verrica's
> President and Chief Executive Officer.

96.     Then, on May 24, 2022, the truth fully emerged when Verrica announced that it

received another CRL from the FDA in connection with the NDA for VP-102. The press release

stated, in relevant part:

> Verrica Pharmaceuticals Inc. (Verrica) (Nasdaq: VRCA), a dermatology
> therapeutics company developing medications for skin diseases requiring medical
> interventions, today announced that the U.S. Food and Drug Administration (FDA)
> has issued a Complete Response Letter (CRL) regarding its New Drug Application
> (NDA) for VP-102 for the treatment of molluscum contagiosum (molluscum).
>
> The only deficiency listed in the CRL was related to the deficiencies identified at a
> general reinspection of Sterling Pharmaceuticals Services, LLC (Sterling), the
> contract manufacturing organization (CMO) that manufactures Verrica's bulk

solution drug product. Sterling advised Verrica on May 20, 2022 that it received notice that it is on OAI status. Sterling's OAI classification resulted from a week-long reinspection of the CMO conducted by FDA in February 2022. The reinspection was conducted approximately 90 days after Sterling was originally classified by the Agency as VAI (Voluntary Action Indicated) on November 17, 2021. Verrica understood that the VAI classification did not indicate that a reinspection was required.

The CRL did not identify any other deficiencies. Moreover, none of the issues identified by FDA during the reinspection were specific to the manufacturing of VP-102. Additionally, Verrica was informed by the Division that it had completed its review of Verrica's NDA and product label, there were no open questions on the NDA review, and the VP-102 label was ready to be communicated. However, Verrica has been informed that internal FDA policy is preventing the Agency from communicating the label and approving the NDA when a CMO has an unresolved classification status or is placed on OAI status.

"Based on the successful PAI of VP-102 at Sterling and our understanding that the Division was ready to communicate our label, we believe our NDA meets the statutory standards for approval and that any issues at Sterling do not impact the manufacturing, quality, efficacy, or safety of VP-102," commented Ted White, Verrica's President and Chief Executive Officer. "However, we recognize that the Dermatology Division's hands may be tied due to the reinspection issues at Sterling and thank them for their efforts working with us to date." In addition, Mr. White noted that "VP-102 is a non-sterile topical dermatology product that is not systemically absorbed. It is completely solvent based and has been demonstrated to have bactericidal and viricidal properties. By comparison, the observations cited at Sterling which led to its OAI classification status were predominantly related to its distinct sterile operations where higher-risk, sterile ophthalmic products are manufactured by Sterling for, among other distributors, the U.S. government."

97.     On this news, the Company's stock price fell $3.55 per share, or approximately 63.8%, to close at $2.01 per share on May 25, 2022.

**The Securities Class Action**

98.     The Securities Class Action was filed against the Company, Defendant White, and other Company officers on June 6, 2022.

99.     The plaintiff in the Securities Class Action filed a second amended complaint on January 26, 2024 (the "Securities Class Action Second Amended Complaint"). On March 11, 2024, the defendants in the Securities Class Action filed a motion to dismiss the Securities Class

Action Second Amended Complaint (the "Securities Class Action MTD").

100.    On September 3, 2024, this Court entered a memorandum opinion, denying the

Securities Class Action MTD in part and granted the Securities Class Action MTD in part (the

"Securities Class Action MTD Opinion").

101.    The Securities Class Action MTD Opinion stated, in relevant part that:

I previously ruled that Plaintiff had adequately alleged violations of the securities laws by Verrica and White as to Defendants' public statements in May and June 2021. . . .

As to Defendants' statements in March through May 2022, I previously ruled that Plaintiff had adequately pled all elements except scienter. Plaintiff's Second Amended Complaint offers new allegations regarding Defendants' knowledge of Sterling's quality problems during that time. According to an anonymous former Verrica employee who claims to have personally traveled to Sterling's site during the February 2022 FDA inspection, Sterling sent Verrica's senior management, including White, daily updates on the inspection, including the FDA's conclusion that quality problems similar to those found in May 2021 remained. White allegedly "grilled" Sterling about its earlier promises to fix those problems.

These allegations raise a "strong inference" that White understood it was misleading to tell investors at subsequent conferences and in public filings that the problems at Sterling had been addressed through a "successful resolution". . . .

Plaintiff alleges White knew the February 2022 inspection at Sterling had found quality problems similar to those that had already resulted in Verrica's application being denied once, and understood their significance because he "grilled" Sterling about why the problems had not been fixed. These facts raise a strong inference that White knew it was misleading to tell investors the problems had been successfully resolved.

Securities Class Action MTD at 8-9 (internal citations omitted).

102.    The Securities Class Action is still pending before this Court.

### *Harm to the Company*

103.    As a direct and proximate result of the Individual Defendants' misconduct, Verrica

has lost and expended, and will lose and expend, millions of dollars.

104.    Such expenditures include, but are not limited to, the legal fees associated with the Securities Class Action filed against the Company and Defendant White and amounts paid to outside lawyers, accountants, and investigators in connection therewith.

105.    Such expenditures also include, but are not limited to, significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

106.    Furthermore, the Securities Class Action has exposed the Company to massive class-wide liability.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

107.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

108.    Plaintiff will adequately and fairly represent the interests of Verrica and its shareholders in enforcing and prosecuting its rights.

109.    Verrica is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

110.    Plaintiff is a current shareholder of Verrica and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein.  Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

111.    A pre-suit demand on the Board of Verrica is futile and, therefore, excused.  At the time this action was commenced, the seven-person Board consisted of Individual Defendants White, Manning, Stalfort, Ballaron, Prygocki, Eichenfield, and Nguyen (the "Director Defendants").  As set forth below, all of the Director Defendants are incapable of making an

independent and disinterested decision to institute and vigorously prosecute this action because they face a substantial likelihood of liability for the misconduct alleged herein. Therefore, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

112.   The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

113.   Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

114.   Each of the Individual Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

115.   As members of the Board charged with overseeing the Company's affairs, each of the Director Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims.  Specifically, as Board members of Verrica, the Director Defendants knew, or should have known, the material facts surrounding Verrica's financial condition and internal control mechanisms.

116.   Defendant White is not disinterested or independent.  Defendant White is serves as

the Company's CEO and President and was named as a defendant in the Securities Class Action. Furthermore, in a Proxy Statement filed by the Company on a Schedule 14A with the SEC on April 19, 2024, the Company conceded that Defendants White, Manning, and Stalfort are non-independent directors Thus, the Company admits that Defendants White, Manning, and Stalfort are non-independent directors.

117.    Additionally, the Director Defendants have longstanding business and personal relationships with each other. For instance, from 2011 until 2017, Defendant White served as President and General Manager at Almirall, which is the parent company of Aqua Pharmaceuticals Holdings, Inc. ("Aqua Pharmaceuticals"). Defendant Ballaron was the co-founder of Aqua Pharmaceuticals and served as CEO, President, and a member of the Board of Aqua Pharmaceuticals from 2004 until 2015. Thus, Defendants White and Ballaron are not independent nor disinterested.

118.    Moreover, Director Defendants White, Manning, Stalfort, Ballaron, Prygocki, Eichenfield, and Nguyen signed the 2021 10-K. Defendant White also signed the 3Q21 10-Q and the 1Q22 10-Q and signed SOX Certifications that were attached to the 2021 10-K, 3Q21 10-Q, and 1Q22 10-Q. Accordingly, these Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile, and, therefore, excused.

119.    Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

120.    Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and

procedures and failed to make a good faith effort to correct the problems or prevent their recurrence. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

121.    Additionally, the Director Defendants took no action to redress the harm suffered by the Company resulting from the misconduct alleged herein.

122.    Defendants Ballaron, Eichenfield, and Prygocki (the "Audit Defendants") serve on the Company's Audit Committee, and pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial reporting and the underlying internal controls and procedures over financial reporting. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business, finances, and operations, as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

123.    The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability

for breaching their fiduciary duties, and therefore demand upon them is futile.

124.    Accordingly, a pre-suit demand on the Board is futile and excused.

### COUNT I

**Against the Individual Defendants for Violations of § 10(b)
of the Exchange Act and Rule 10b-5**

125.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

126.    The Individual Defendants violated § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

127.    The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

128.    The Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated.

129.    The Individual Defendants acted with scienter because they (i) knew that the public documents and statements issued or disseminated in the name of Verrica were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance

or dissemination of such statements or documents as primary violations of the securities laws.

130.    The Individual Defendants, by virtue of their receipt of information reflecting the true facts of Verrica, their control over, and/or receipt and/or modification of Verrica's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Verrica, participated in the fraudulent scheme alleged herein.

131.    As a result of the foregoing, the market price of Verrica common stock was artificially inflated. In ignorance of the falsity of the statements, stockholders relied on the statements described above and/or the integrity of the market price of Verrica common stock in purchasing Verrica common stock at prices that were artificially inflated as a result of these false and misleading statements and were damaged thereby.

132.    In addition, as a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including the costs and expenses incurred in defending itself in the Securities Action and reputational harm.  The Individual Defendants, through their violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, have exposed the Company to millions of dollars in potential class-wide damages in the Securities Class Action.

## COUNT II

### Against the Individual Defendants
### For Breach of Fiduciary Duty

133.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

134.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

135.    Each of the Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, good faith, loyalty, oversight, and supervision.

136.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

137.    Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (i) the FDA's investigation of Sterling in May 2021, and the Form 483 issued therewith; (ii) that the deficiencies identified by the FDA as a result of the May 2021 investigation were not resolved; (iii) the FDA's investigation of Sterling in February 2022 and the Form 483 issued therewith; (iv) that the foregoing FDA investigations and identified deficiencies posed significant risks to FDA approval of VP-102; and (v) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

138.    The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly

engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

139. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein.

140. As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

141. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

142. Plaintiff, on behalf of Verrica, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

143. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

144. By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual

Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

145.     Plaintiff on behalf of Verrica has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

146.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

147.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Verrica.

148.     The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Verrica that was tied to the performance or artificially inflated valuation of Verrica, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

149.     Plaintiff, as a shareholder and a representative of Verrica, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

150.     Plaintiff on behalf of Verrica has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants for Waste of Corporate Assets

151.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

152.   The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue.   It resulted in continuous, connected, and ongoing harm to the Company.

153.   As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending against the Securities Class Action.

154.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

155.   Plaintiff on behalf Verrica has no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.   Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.   Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.   Awarding punitive damages;

D.   Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all claims set forth herein.

Dated: October 21, 2024

**GRABAR LAW OFFICE**

By: _____

Joshua H. Grabar, Esq.
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Tel:  267-507-6085
Email: jgrabar@grabarlaw.com

*Counsel for Plaintiff*

OF COUNSEL:

**RIGRODSKY LAW, P.A.**
Seth D. Rigrodsky
Timothy J. MacFall
Vincent A. Licata
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
Facsimile: (302) 654-7530
sdr@rl-legal.com
tjm@rl-legal.com
vl@rl-legal.com

## **VERIFICATION**

I, Ivan S. Cohen, have reviewed the allegations made in the Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a holder, of Verrica Pharmaceuticals, Inc. common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this _____ day of _____ 2024.

10/18/2024

DocuSigned by:

*IVAN COHEN*

772D9310FC9844B...

_____
Ivan S. Cohen